Good morning, Your Honors. May I reserve two minutes for rebuttal? Yes, but please watch your clock. You've got to leave two minutes up there in green, okay? Okay. Your Honors, the reason that we're here today – oh, and I'm sorry, I'm Lenore Perretta. I represent Danielle Revolorio, the petitioner. The reason that we're here today is because DHS has kept Mr. Revolorio's case on two separate tracks. On the one hand, he has a deportation order after an asylum denial, which predated the ABC agreement, and no possibility of a work permit. On the other hand, he was allowed to ABC register, file a new asylum application, and apply for work permits from 1991 until the present. All right, well, let's – you know, I mean, obviously, your client has a little bit of responsibility in this, that he didn't show up at a hearing that he knew about. And then I know what the other facts are as far as that goes. The question I have is that I'm not really sure – all right, the government, in my understanding, has conceded he should have had his asylum hearing, the ABC asylum hearing, but they said – but the court – they said, well, we don't have jurisdiction because you're in court proceedings, and so now they're going to give him that hearing. Now, the fact that he has a deportation order against him because he didn't show up and in absentia and all of that, if he has this hearing, is that deportation order – will that prohibit him from getting relief? Can he still prevail in that hearing? No, no, Your Honor. My understanding of reading the ABC settlement is that the CIS asylum office only has jurisdiction over that asylum claim if the case is administratively closed. Once there is a deportation order, CIS does not have jurisdiction even to conduct an interview, much less to make a decision on the asylum case. So even assuming that they do conduct an interview and they do grant the asylum, that would not take care of the deportation order. And I don't think they would have jurisdiction to grant that asylum. So he still has – he would still be – Well, but I thought the ABC order, when that happened, that it anticipated covering people that already were in deportation proceedings or may have had deportation orders. It covered those who were in deportation proceedings on the time of November 30, 1990. His deportation proceedings were concluded by November 5, 1990. So it did not affect – So you have to set that aside in order to be successful. Did you argue that he was entitled to equitable tolling before the BIA? I think that I did. I did not elaborate on that argument. You didn't use the words. I think I did use the words in the motion to reopen to the immigration judge. And then in my motion to reopen to the BIA, my very first paragraph says that I am including all of the arguments that were laid out below to the immigration judge. So you think the words – I can find the words equitable tolling? Yes. I looked for them, and they are in there. Where are they on the record? They are – I don't have the record right in front of me, but it's in the motion to reopen to the immigration court. And my understanding of what the government is arguing with respect to equitable tolling is that we didn't raise the equitable estoppel. That was my understanding of their brief. And the BIA doesn't have jurisdiction to adjudicate that issue anyway. It cannot give an equitable remedy. And the case that they cite specifically says that. Well, can we find that your client was diligent for equitable tolling purposes given that he did not appear in his November 1990 hearing or call the immigration court to find out what happened? Yes, I think we can. And the reason is because if we understand what was happening at the time of the ABC settlement, it was approved in January of 91, but it was settled in late 1990, and initially the court approved a settlement in December. But by the time of his hearing, it was already settled between the parties. And the news – No, but tell me how we can find that he was diligent when he missed something and he didn't ever check on it. Because of the ABC settlement. Because all over the news, there was an advertisement, and this is the language right out of the ABC settlement, your deportation case will be stopped during the time of your ABC asylum interview and decision. That was all over the news, especially in Los Angeles where he lived. It was posted, it was on the radio, it was on the newspapers. Guatemalans and Salvadorans, your deportation will be stopped while you renew this. Has the BIA ever addressed this order in the first instance? Facts like yours, saying that someone like yours would be? Not in a published decision. Recently, within the last two months, the BIA has granted sua sponte reopening to a case with weaker facts than this one, because in that case it was a derivative NACARA applicant, not a principal NACARA applicant. Well, let's just say if we think that what you're saying has some merit, and I'm not speaking for anyone on the panel, I'm not even speaking for myself, I'm giving you a hypothetical. Should this be remanded to the BIA to determine this in the first instance? I'm sorry, which part? Well, equitable tolling, to determine equitable tolling. Part of the argument that I made to the BIA to sua sponte reopen was because the filing deadline should be equitably tolled. So I think the BIA has already considered that. When did your client actually find out about his deportation order in relation to the ABC case? He found out about his deportation order when he was arrested at the time of applying for NACARA in 2004. He did not know until 2004 that there was a deportation order, precisely because of these two separate tracks. Had he received notice of an absentia deportation? No, he did not. He had moved. And because of the ABC settlement and applying for the ABC registration, he believed that the service had his current address. One would think that the same one agency would be two different departments, one agency would be talking to each other or at least know what records each other had. There's only one file, Your Honor. There's one alien registration number. He used the same alien registration number. Well, they sent it to his old address because they didn't have his new address, and they sent it in English. That's part of your claim, right? Yes. But he knew at the prior hearing he was notified in Spanish, you have to be at the hearing. So those are the facts that are basically. He was notified that he had to be at the hearing. I mean, he claims he didn't receive it, but it's fairly undisputed. He was notified in Spanish, you have to be at the next hearing. He didn't appear at the next hearing. It's fairly undisputed that it was sent to, a notice was sent to an address that they had listed and it was sent in English. I'm not sure he understood that. Yeah, I mean, those are, that's maybe what's disputed factually. Yeah, but what I don't understand is how, so there's one alien file, and he's applying, he's got this deportation order in there, but then also it has his application in the ABC, and the government is pursuing that as giving him remedies under that as well, down to and including a hearing. Yes, but in fact, because of the outstanding order, he should not have been allowed to pursue those remedies without addressing the outstanding order. So at some point in time, normally the government would deny a work permit application if someone has an outstanding order, and that's what should have happened. But that's what I don't understand. It granted his employment authorization for 14 years, and that's all in the file too. So after an order of deportation, you've got 14 years of granting work authorization. Exactly. That's exactly my point, which shouldn't have happened, because if at any time they had sent a notice of intent to deny a work permit and said you need to address this underlying order before we can go forward on this case, that would have given him the notice that he needed in order to file a motion to reopen, and in order not to miss the statutory deadline for NACARA motion to reopen in 1998. So there was, without him knowing about this order, there was nothing that he can do. But DHS is trying to hold him to a higher standard than it even holds itself. They had all the information in that file, everything, and they're experts on these issues. They never, ever raised an issue in 14 years. To this day, he has a valid work permit. And to this day, we're still on two tracks. We're still getting an asylum interview that there isn't any jurisdiction for. Somehow these tracks need to come together so that he can pursue his NACARA, which is the only relief available to him and his wife as a derivative. All right. Well, you've used all your time. I'll give you a couple extra minutes after we talk to the government attorney. Okay. Thank you, Your Honor. May it please the Court. My name is Elizabeth Young, and I represent the government. As an initial matter, I'll clarify two of the Court's questions that came up during argument. First, with respect to his application for asylum under the ABC program, the de novo asylum application, as soon as I was made aware that his de novo asylum application interview was canceled, I contacted CIS in L.A. and in Salt Lake City where Mr. Revolario currently resides, and they gave me assurances that another interview would be scheduled. And so I would personally follow up to make sure that that would happen. Now, if Mr. Revolario chooses to pursue this form of relief, as he can during the ABC settlement agreement, and he's granted asylum, then he will be able to then file a motion to reopen and rescind the initial removal order, the in absentia removal order. So if they're not going to ‑‑ so she wasn't correct on, say, if, for example, if ‑‑ well, let's say if we stayed ruling on the motion to reopen and he had his hearing, which seems like it would be a good idea that it should happen soon, since the government does say it shouldn't have been canceled in the first place. If he has that and he wins, then does that moot what we have to do, or does it still have to be ‑‑ somehow that has to be dealt with? He would still have to file a motion to reopen the in absentia removal order. However, if he could come forward and say that he had been granted asylum under the ABC program, the odds of that happening would be very strong. Well, what I don't understand is why you have to go through all these procedural hoops. I mean, it's one file, it's one government agency. If he gets asylum under ABC, which it seems like he's eligible for that, he's been granted these work authorizations all these years, why can't you just talk to each other and get it done, get what's right done, you know, whatever you decide? I mean, why does he have to go through that hearing and get the asylum and then go do another motion to reopen, re‑stay ours, and disappeal? Well, would the government contest a motion to reopen if he's granted asylum? I cannot speak to that personally because that would be DHS joining in that motion to reopen. So that's something we would have to work through. So I couldn't personally say that I couldn't object to that motion to reopen. But to answer Your Honor's question, I understand the confusion and the frustration with the two branches of DHS. But what typically happens is that when an individual like Mr. Revelario goes into removal proceedings, it comes under the jurisdiction of the immigration judge. And that would no longer be a CIS concern. However, the ABC settlement agreement confuses things a little bit because even if an individual was in these removal proceedings, he would then go back to CIS and get a new de novo asylum application. So here his A file was currently with INS, but CIS should have been the one adjudicating his application for asylum under the de novo agreement. And therefore, that's why a little bit of confusion arose under the settlement agreement. Should we send this to mediation and not submit it to send it to mediation and let the agency work it out? I mean, maybe that's a possibility, right? Your Honor, I told Ms. Peretta as soon as I found out this mistake happened that the government would be willing to put this in mediation pending the resolution of his de novo asylum application. She indicated to me that she wasn't sure whether he wanted to pursue that relief at this time. Well, if he thought he was going to lose, might he think that would be a good idea? That's a possibility, Your Honor. I mean, you know, that's the, you know, sometimes people need to see the eyes of the court to realize, you know, there are no guarantees. But the thing is our Ninth Circuit mediation has been working very successfully in the past year with DHS, year or two, I think, working very successfully on some of these claims to work out what both parties think is appropriate in the circumstances. And maybe we should give you a chance to do that. I wouldn't be opposed to that, Your Honor. I've personally participated in the mediation program and found it very helpful. So if that's something that Ms. Peretta would agree to, we'd be more than willing to comply. Okay. Do you have any questions? I don't have any questions at this point. Other than to find out whether or not Mr. Revolorio might be interested in the mediation program. Your Honor, we've already mentioned the issue. Well, you know, I'm going to tell you, I'm not going to tell you how I'm going to decide this, but I'm going to tell you he needs to think about it, you know, because that gives him an opportunity to see if he gets asylum, then coordinate the other thing without running the risk of this Court affirming, saying that, you know, they didn't, because what's the standard of review for the motion to reopen? Abuse of discretion. Abuse of discretion. What's one of the hardest standards to overturn? That's, you know, that's the rock you push uphill, whereas when you have an opportunity, you know, I mean, obviously if they don't give him asylum, then that doesn't really matter, but it allows him an opportunity to, you know, I'm not telling you what to do, but it's, I'm telling you abuse of discretion is a tough standard, and I have concerns about his ability to show diligence or certainly or maybe if it should go back for the BIA to make, I think that there was a case that happened in the interim that dealt with equitable tolling that these parties haven't necessarily dealt with, and I have an interest in allowing the BIA to speak first on how something applies before we weigh in as a court, but, and I think that generally with agency work, if you can develop a record, but so. Well, have you been through Ninth Circuit mediation? Yes, the government, well, yes, we were. Did the government take the position that they're taking right now? Yes. No, the government took the position that they were not. Well, now you've already, okay, so, you know, we have actually the power to order this mediation without your client's consent, and maybe if we think it's the best thing to do, we'll do that, but it just, it seems as though that would be the best avenue to pursue at this juncture. So pursue mediation again, Your Honor? Yes, the government's representatives just. We can decide the case if mediation doesn't work out, but, you know, the thing is that, you know, there's something that's, you know, abuse of discretion is a tough standard, and in terms of the court making bad law on certain issues if the facts aren't right, sometimes mediation by people agreeing that certain things can occur is the best way to go, and then there isn't bad law out there, or a person doesn't get a bad result that prevents them from doing certain things. I mean, the government's interest would be not having bad law on diligence in this issue to make this work out. Your interest would be to know that if you get asylum, that then if they're concerned about bad law, that maybe they'll coordinate on the motion to reopen, it can be worked out, and then that this particular law can develop otherwise. I mean, your client does have some facts that are not favorable on a motion to reopen. Your Honor, may I just make another comment? My experience with Guatemala asylum is the government is not going to approve his asylum. His case was much different in 1986 when he arrived than it is today. But if they don't approve his asylum, then the other doesn't matter. It matters because he's still statutorily eligible for Nicaragua for the deportation order. No, no, you're not understanding. What would be sent to mediation would be that both aspects of this case, both the CIS error in not giving your client the hearing would be the combination of the two cases and the relationship and the effect of the one on the other. All right. Do you have anything else to say? We're still in the time. What are the other questions? Well, do you have concerns about the diligence aspect relative to equitable tolling? Yes, Your Honor. From the government's perspective, and if this Court were to say that he was diligent in an opinion, do you have concerns about that? Yes. The government would obviously not want bad law on that issue, but I just. . . Well, but that's the vulnerability that the government has. Of course. That I would indicate that the government should think about. And, I mean, I think obviously you have. Right. I just wanted to emphasize that although she's been in mediation before, at this point I have figured out what the problem was, and now we're in a different position in that I know he was entitled to that asylum interview. And, therefore, like I said to her on the phone, I would make assurances that we would do our best to rectify the situation. All right. Thank you, counsel. You're welcome. Thank you. Thank you, counsel. We're going to defer submission on this case and issue an order shortly. So thank you both, and we will take up the case of Baca v. Holder. Thank you.
judges: Sedwick, Wardlaw, Callahan